IN THE COURT OF APPEALS OF NORTH CAROLINA

 2021-NCCOA-559

 No. COA21-178

 Filed 19 October 2021

 Alamance County, Nos. 20 JA 126, 20 JA 127, 20 JA 128

 IN THE MATTER OF:

 W.C.T., W.J.A.T., & W.D.T.

 Appeal by respondents from order entered 17 December 2020 by Judge

 Kathryn W. Overby in Alamance County District Court. Heard in the Court of

 Appeals 11 August 2021.

 Wendy Walker for Petitioner-Appellee Alamance County Department of Social
 Services.

 Office of the Parent Defender, by Parent Defender Wendy C. Sotolongo and
 Assistant Parent Defender J. Lee Gilliam, for Respondent-Appellant-Mother.

 Edward Eldred for Respondent-Appellant-Father.

 Forrest Firm, P.C., by Brian C. Bernhardt, for Guardian ad Litem.

 CARPENTER, Judge.

¶1 Respondent-Mother and Respondent-Father (collectively “Respondents”)

 appeal from the trial court’s Adjudication and Disposition Order adjudicating minor

 child, Wade,1 as an abused, neglected, and dependent juvenile; adjudicating the other

 1 Pseudonyms have been used to protect the identities of the children.
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 two minor children, Wes and Wren, as neglected and dependent juveniles; and vesting

 custody of the children with Alamance County Department of Social Services

 (“ACDSS”). Respondents argue the trial court erred in adjudicating Wade abused

 and dependent, and adjudicating Wes and Wren dependent. Respondent-Mother also

 argues the trial court abused its discretion by limiting her visitation with the children

 to highly supervised, one-hour weekly visits; requiring proof of income; and ordering

 her to “refrain from allowing mental health to impact parenting.” Finally,

 Respondent-Mother contends the trial court erred in concluding she acted

 inconsistently with her constitutionally protected status as a parent. For the reasons

 set forth below, we affirm the Adjudication and Disposition Order.

 I. Factual & Procedural Background

¶2 Respondent-Mother and Respondent-Father are the biological parents of three

 children: “Wes,” eight years old; “Wren,” three years old; and “Wade,” one year old.

 Respondent-Mother is legally married to her estranged husband, Peter,2 and was

 married to, but separated from, Peter prior to the births of the three children. Peter

 is not a party to this appeal.

¶3 On 12 March 2020, Wade, then three months old, was taken to Moses Cone

 Hospital for second and third degree burns on 8.3% of his left thigh, left calf, and left

 2 A pseudonym has been used.
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 foot. Immediately after arriving to Moses Cone Hospital, Wade was transferred to

 Wake Forest Baptist Medical Center/Brenner Children’s Hospital (“BCH”) for

 treatment by its burn team. The injury was not witnessed, and the parties have

 offered multiple, inconsistent, and implausible stories to explain the circumstances

 surrounding the child’s injury.

¶4 Respondents reported to Moses Cone Hospital staff that Wade was in a baby

 swing or rocker downstairs when their German Shepherd dog knocked over the

 swing. Respondents alleged that Wade fell out of the swing and was pushed up

 against an electrical space heater for what they estimated was approximately thirty

 minutes; they reported finding him laying against the heater. Respondents claimed

 to have immediately transported Wade to the hospital after discovering his injuries.

 Respondents also told this story to both BCH staff and a Forsyth County Department

 of Social Services (“FCDSS”) social worker who interviewed them on 13 March 2020.

 During the interview with the social worker, Respondent-Mother admitted Wade was

 not yet able to roll over at the time of injury.

¶5 BCH triage notes indicate the “burn distribution is consistent w[ith the] story”

 Respondents told. The notes also document concerns regarding: the child being left

 unattended by a heater, the thirty- to forty-minute period for which Respondents

 could not account, how a dog knocked over the swing, why the space heater was left

 on during a hot day, and why the parents did not immediately hear the child’s cries.
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 The initial screening for domestic violence, abuse, and neglect did not raise concerns;

 however, child abuse protocol was initiated by BCH on 13 March 2020 at 2:30 a.m.

 after BCH received an anonymous phone call from someone who claimed to be

 familiar with Respondent’s family and sought the case be reported to Child Protective

 Services (“CPS”). The caller claimed to have recordings of the paternal grandmother

 threatening Wade the day of his injury. The caller also stated that the paternal

 grandmother often leaves the children unattended and claimed Respondent-Mother

 was at risk for abuse. The attending physician referred Wade for a consultation with

 Dr. Meggan Goodpasture of the BCH Pediatric Child Protection team. Dr.

 Goodpasture met with the maternal grandmother and Respondent-Father. Although

 the maternal grandmother expressed safety concerns in her meeting with Dr.

 Goodpasture, the family had no subsequent meetings with the doctor because

 Respondent-Father advised BCH that he did not want Dr. Goodpasture in Wade’s

 hospital room again. Based on Dr. Goodpasture’s initial consultation, she

 recommended, inter alia, CPS and law enforcement reconstruct the scene of the

 injury and perform full child medical evaluations on each of the three children.

¶6 Guilford County Department of Social Services (“GCDSS”) received a report

 for physical abuse concerning Wade on 13 March 2020. Later that day, GCDSS sent

 a request to FCDSS to assist in the investigation. Social Worker Pope of FCDSS

 interviewed nurse staff of BCH as well as the Respondents. After Social Worker Pope
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 left Wade’s hospital room, Respondent-Father stated to the attending nurse, Nurse

 Green, that the social worker told him the burn was caused by boiling water. He then

 became “visibly upset” and stated, “I feel like I’m being accused of a crime that I did

 not commit.” Respondent-Father indicated an unidentified staff member in scrubs

 had also commented the burn was “from boiling water.” Nurse Green was able to

 “diffuse the situation” by indicating physicians did not have suspicions of

 Respondents’ story, Respondent-Father became more at ease and mentioned he has

 post-traumatic stress disorder (“PTSD”) from being “burned and abused” by his own

 father, which caused him to distrust “the system.” Neither the emergency

 department notes, nor the social workers’ reports state the burn was caused by boiling

 water.

¶7 On 27 March 2020, Dr. John Bailey of the BCH burn team entered a progress

 note regarding Wade’s case. He documented he and Dr. Goodpasture agreed Wade

 “appear[ed] to have suffered a contact burn.” He also noted that neither of the doctors

 could “offer more than a speculation regarding the true mechanism [of the injury],

 although involvement of the pet seems less likely.”

¶8 On 1 April 2020, a Child and Family Team meeting was held between GCDSS,

 Respondent-Mother, and Respondent-Father. At the meeting, Respondents agreed

 to enter a safety agreement whereby the children would be placed with the maternal

 grandparents as a temporary safety provider, Respondents would not have
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 unsupervised visits or overnight stays with the children, and Respondents would

 receive mental health services. Wade was discharged from BCH into the maternal

 grandparents’ care the following day.

¶9 On 2 April 2020, another Child and Family Team meeting was held via

 conference call with Respondents, GCDSS, and the paternal grandmother, and

 Krispen Culberton (“Attorney Culberton”)—attorney for Respondents’ family.

 Attorney Culberton reported Respondents’ concerns for Wren’s behavior and her

 aggression towards Wade. According to Attorney Culberton, Respondents were

 afraid to report they believed Wren caused Wade’s injuries. The paternal

 grandmother claimed at the meeting she was the sole caretaker of the juveniles when

 Wade was injured. According to the paternal grandmother’s version of events, she

 fed Wade and laid him in his bassinet, she put Wren down in her playpen, and she

 went downstairs to prepare dinner. She later sent Wes upstairs to check on Wren

 and Wade. Immediately after, Wes came running downstairs screaming Wade had

 been burned. The paternal grandmother speculated that Wren climbed out of her

 playpen, pulled Wade out of his bassinet, and climbed back into her playpen.

 Following the injury, the paternal grandmother treated Wade’s burns with Vaseline

 before taking him to the hospital. Respondents adopted this story and later reported

 this account of events to Detective Gerald Austin (“Detective Austin”) of the Guilford

 County Sheriff’s Department, who handled the criminal investigation into Wade’s
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 injury.

¶ 10 On 16 April 2020, a child medical evaluation was performed on each of the

 three children by Dr. Esther Smith of the Cone Health Child Advocacy Medical Clinic,

 as recommended by Dr. Goodpasture. In Dr. Smith’s opinion, “it is possible that

 [Wade’s] injuries are consistent with having been burned by prolonged direct or near-

 direct contact with [Respondents’] space heater”; however, she noted “there is a very

 high concern for [an i]ntentional[ly i]nflicted injury (at worst) . . . and/or [n]eglect

 resulting in [an u]nintentional [i]njury (at best).” She expressed concerns for the red

 flags identified by BCH as well as concerns for the “very unsafe infant sleep

 environment” which included lack of supervision, close proximity to a heat source,

 suffocation risk due to excess blankets in bassinet, and potential fall risk due to a

 cradle that may have been improperly assembled.

¶ 11 In May of 2020, the case was transferred from GCDSS to ACDSS due to a

 potential conflict of interest that arose after Respondent-Father and his attorney

 threatened to sue GCDSS and/or its employees over an alleged HIPAA violation.

¶ 12 On 21 July 2020, concerns arose regarding the kinship placement with the

 maternal grandparents when ACDSS social workers arrived at the maternal

 grandparents’ home unannounced and found the maternal grandmother

 overwhelmed with caring for the children. The maternal grandmother admitted that

 she was frustrated by Respondents’ tardiness to scheduled visitations. She also
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 admitted to “backhand[ing]” Wren after Wren spit in her face. ACDSS immediately

 terminated the kinship placement and advised Respondents that a replacement

 temporary safety provider was needed.

¶ 13 On 21 July 2020, the children were placed with a neighbor of the maternal

 grandparents who agreed to be a temporary placement until 21 August 2020.

 Respondents gave ACDSS the name of another family for a potential placement.

 However, one of the proposed caretakers of the new family was an employee of

 ACDSS so the agency concluded the family was ineligible due to a conflict of interest.

 In August of 2020, ACDSS received multiple phone calls from individuals who

 claimed Respondents were seeking potential placements off the street and through

 social media. ACDSS held a Child and Family Team meeting with Respondents on

 21 August 2020 to inform them that the agency would need to seek court involvement

 if Respondents could not provide a viable placement option. After Respondents did

 not provide an alternative placement, ACDSS informed the parents that it would be

 filing a non-secure order for custody of the children.

¶ 14 On 21 August 2020, ACDSS filed a petition alleging Wade was an abused,

 neglected, and dependent juvenile, and petitions alleging Wes and Wren were

 neglected and dependent juveniles. The petitions alleged, inter alia: (1) “that

 [Wade’s] parents and/or caretaker have inflicted or allowed to be inflicted serious

 physical injury, possible by other than accidental means and/or created a serious risk
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 of physical injury by other than accidental means”; (2) that “[t]he juveniles have been

 neglected in that the juveniles do not receive appropriate care, supervision, or

 discipline from their parents and/or caretaker”; (3) “[t]hat the parents do not have an

 appropriate plan of care for the juveniles”; and (4) “[t]hat the juveniles would be at

 significant risk of harm if placed with the parents and/or paternal grandmother.”

¶ 15 On 21 August 2020, the Alamance County District Court issued orders for

 nonsecure custody of the three children, finding a reasonable factual basis to conclude

 the children were exposed to a substantial risk of physical injury. The court ordered

 the children placed in nonsecure custody with ACDSS and set a hearing on 26 August

 2020 to determine the need for continued nonsecure custody. ACDSS obtained

 nonsecure custody of the children and placed them together in a foster home in Moore

 County.

¶ 16 On 26 August 2020, a hearing was held before the Honorable Kathryn W.

 Overby to determine the need for continued non-secure custody of the children.

 Following the hearing, Judge Overby entered an order on 16 September 2020 finding,

 inter alia, that the juveniles’ return to their own home would be contrary to the best

 interests of the juveniles, and mandating, inter alia, that temporary custody of the

 juveniles be continued in ACDSS for non-secure placement.

¶ 17 An adjudication hearing was held between 18 November 2020 and 20

 November 2020 before Judge Overby. Testimony was given by two social workers
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 familiar with the case, Respondent-Mother, Respondent-Father, the maternal

 grandmother, a co-worker of Respondent-Mother, Detective Austin, and the guardian

 ad litem for the children.

¶ 18 Detective Austin testified he investigated the case after he became aware

 through BCH that a child “suffered burns under suspicious circumstances . . . .”

 Detective Austin spoke with Respondent-Mother and Respondent-Father while they

 were visiting BCH on 18 March 2020, to make them aware of his investigation.

 Respondent-Father used a recording device to record his conversation with Detective

 Austin and advised he had an attorney.

¶ 19 Detective Austin testified he obtained a search warrant to search Respondents’

 home and executed the search warrant on 19 March 2020. Two GCDSS social

 workers accompanied him during his search of the home. Detective Austin testified

 he seized the space heater that was alleged to have been the mechanism of the injury

 and took photographs of Respondents’ home. He later performed tests on the heater

 using a “calibrated thermometer to record temperatures at . . . different points” of the

 heater. He determined that at the vents of the heater, the temperature fluctuated

 between 178.7- and 248.6-degrees Fahrenheit, rather than keeping a steady

 temperature. The vents were the warmest points of the heater. Following Detective

 Austin’s investigation, Respondent-Father, Respondent-Mother, and the paternal

 grandmother were charged with and arrested for felony negligent child abuse
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 resulting in serious bodily injury.

¶ 20 Respondent-Mother testified as to the events of 12 March 2020. According to

 Respondent-Mother, she called her mother to pick her up because Respondent-Father

 took the truck she had driven to work, to get it fixed and inspected, and he was not

 answering his phone. Respondent-Mother testified she left the store between 5:00

 p.m. and 5:30 p.m. When asked why she gave multiple stories regarding Wade’s

 injury, Respondent-Mother responded that she and Respondent-Father “panicked,”

 and “were terrified that something was going to happen to [Wren].”

¶ 21 The maternal grandmother testified that Respondent-Mother called her upset

 and crying at about 4:00 p.m. on 12 March 2020 and told her mother she did not have

 a ride home; the maternal grandmother agreed to pick up Respondent-Mother at the

 end of her shift. Shortly after 5:00 p.m., Respondent-Mother called the maternal

 grandmother to tell her she was ready to be picked up. When the maternal

 grandmother arrived around 5:30 p.m., Respondent-Mother stated, “she did not want

 to go back home” and requested to go to the maternal grandmother’s house instead.

 Respondent-Mother told the maternal grandmother that Respondent-Father and the

 paternal grandmother leave the children alone, and Respondent-Mother has found

 the children alone when she has come home from work. At approximately 6:00 p.m.,

 Respondent-Father arrived at the maternal grandmother’s house. Respondents

 spoke in the driveway for approximately two hours regarding “some incidents that
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 were happening at the store” where Respondent-Mother worked. The maternal

 grandmother testified that Respondent-Father’s phone “kept ringing,” and he

 “eventually . . . tossed it over into the yard . . . .” When Respondent-Mother was asked

 at the hearing if she was arguing with Respondent-Father at the maternal

 grandmother’s home on the evening of 12 March 2020, Respondent-Mother stated

 they were discussing her job because she was trying to have the district manager

 transfer her co-worker “Robert,”3 who had been “making sexual advances towards”

 her.

¶ 22 The record reveals the paternal grandmother called Respondent-Father

 eighteen times between 7:01 p.m. and 7:52 p.m. and Respondent-Father answered

 just one of her calls at 7:52 p.m. Respondent-Father then “hurried [Respondent-

 M]other home without telling her the nature of the phone call.” The maternal

 grandmother’s testimony indicates Respondents left her home between 8:00 p.m. and

 8:20 p.m. According to Respondent-Mother, she and Respondent-Father arrived at

 their home at about 8:15 p.m. Respondent-Mother testified Wade was not crying

 when they got home. She took him upstairs to look at his burns. Shortly thereafter,

 Respondents took Wade to the hospital.

¶ 23 Respondent-Mother’s co-worker Robert testified regarding events that had

 3 A pseudonym has been used.
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 transpired at the store and incidents in which Respondent-Mother had confided in

 him. According to Robert, he would “hear things from other people” about

 Respondent-Mother and would ask Respondent-Mother if they were true. On one

 such instance, Robert asked Respondent-Mother if the paternal grandmother “had

 pulled a gun on her when [Wes] was a young boy . . . and told [Respondent-Mother]

 that she would hurt her and no one would ever find her,” while the two were in the

 presence of Wes. Robert testified Respondent-Mother confirmed this incident had

 occurred. Robert also testified to speaking with Respondent-Mother the day of

 Wade’s injury. Respondent-Mother told him that just the day before, on 11 March

 2020, “she . . . went home and the kids were at home by [themselves], and it was a

 couple hours later that [the paternal grandmother] and [Respondent-Father]” arrived

 home. On the day of 12 March 2020, Robert testified he saw Respondent-Father and

 the paternal grandmother behind the store dumping their personal trash in the

 store’s dumpster. He did not see the three children in the pickup truck. Later that

 day, Robert overheard the store’s manager on duty taking a call from the paternal

 grandmother. Robert testified he could hear the paternal grandmother through the

 phone using obscenities referring to the Respondent-Mother and stating,

 “[Respondent-Mother] needs to come home and take care of her children or someone

 would take care of them for her.”

¶ 24 An initial disposition hearing was held before Judge Overby on 20 November
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 2020 following the adjudication hearing. After the presentation of all evidence, the

 trial court announced its judgment in open court and ordered custody of the juveniles

 be vested with ACDSS. On 17 December 2020, the trial court entered the

 Adjudication and Disposition Order in which it made factual findings supported by

 clear and convincing evidence to conclude Respondents and/or a caretaker inflicted

 or allowed to be inflicted serious physical injury possible by other than accidental

 means and/or created a serious risk of physical injury by other than accidental means,

 Respondents and/or a caretaker did not provide appropriate care or supervision for

 the juveniles, and Respondents and/or a caretaker created an injurious environment

 placing the juveniles at substantial risk of harm. The trial court also concluded Wade

 is an abused, neglected, and dependent juvenile, and Wes and Wren are neglected

 and dependent juveniles. Respondent-Mother and Respondent-Father each filed

 timely notices of appeal from the Adjudication and Disposition Order.

 II. Jurisdiction

¶ 25 This Court has jurisdiction to address Respondent-Father’s and Respondent-

 Mother’s appeals from the Adjudication and Disposition Order pursuant to N.C. Gen.

 Stat. § 7A-27(b)(2) (2019) and N.C. Gen. Stat. § 7B-1001(a)(3) (2019).

 III. Issues

¶ 26 On appeal, Respondent-Mother and Respondent-Father raise two common

 issues: (1) whether the trial erred in adjudicating Wade an abused juvenile; and (2)
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 whether the trial court erred in adjudicating Respondents’ three children dependent

 juveniles. Respondent-Mother raises three additional issues: (1) whether the trial

 court erred in ordering Respondent-Mother to show proof of income and to refrain

 from allowing mental health to impact parenting as steps to remedy the conditions

 in the home that led to the juveniles’ adjudications; (2) whether the trial court abused

 its discretion in limiting Respondent-Mother’s visitation with the children to highly

 supervised, one-hour weekly visits; and (3) whether the trial court erred in concluding

 Respondent-Mother had acted inconsistently with her constitutionally protected

 parental status.

 IV. Adjudication

 A. Standard of Review

¶ 27 “The allegations in a petition alleging that a juvenile is abused, neglected, or

 dependent shall be proved by clear and convincing evidence.” N.C. Gen. Stat. § 7B-

 805 (2019). “When reviewing a trial court’s order adjudicating a juvenile abused,

 neglected, or dependent, this Court’s duty is ‘to determine (1) whether the findings of

 fact are supported by clear and convincing evidence, and (2) whether the legal

 conclusions are supported by findings of fact.’” In re F.C.D., 244 N.C. App. 243, 246

 780 S.E.2d 214, 217 (2015) (quoting In re T.H.T., 185 N.C. App. 337, 343, 648 S.E.2d

 519, 523 (2007) (citation, quotation marks, and brackets omitted), aff’d as modified,

 362 N.C. 446, 665 S.E.2d 54 (2008)). “If supported by competent evidence, the trial
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 court’s findings are binding on appeal even if the evidence would also support

 contrary findings.” Id. at 246, 780 S.E.2d at 217 (citation omitted). Unchallenged

 findings of fact are deemed supported by competent evidence and binding on appeal.

 In re J.M.W., 179 N.C. 788, 792, 635 S.E.2d 916, 919 (2006) (citation omitted). The

 determination of whether a child is abused, neglected, or dependent is a conclusion

 of law. In re Ellis, 135 N.C. App. 338, 340, 520 S.E.2d 118, 120 (1999). The trial

 court’s conclusions of law are reviewed de novo. In re Pope, 144 N.C. App. 32, 40, 547

 S.E.2d 153, 158 (citation omitted), aff’d, 354 N.C. 359, 554 S.E.2d 644 (2001).

 B. Adjudication of Abuse

 1. Findings of Fact regarding Abuse

¶ 28 On appeal, Respondent-Mother argues the trial court erred in adjudicating

 Wade abused on the basis there was no clear and convincing evidence that the

 injuries were “other than accidental.” Similarly, Respondent-Father contends “[t]he

 trial court’s evidentiary findings of fact do not support the ultimate finding that

 Wade’s injury was non-accidental”; rather, the findings establish that the injury was

 “caused by a ‘lack of supervision.’”

¶ 29 The Juvenile Code defines an “abused juvenile” in pertinent part as

 [a]ny juvenile less than 18 years of age . . . whose parent,
 guardian, custodian, or caretaker:

 a. [i]nflicts or allows to be inflicted upon the juvenile a
 serious physical injury by other than accidental means;
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 [or]

 b. [c]reates or allows to be created a substantial risk of
 serious physical injury to the juvenile by other than
 accidental means.

 N.C. Gen. Stat. § 7B-101(1)(a)-(b) (2019).

¶ 30 “This Court has previously upheld adjudications of abuse where a child

 sustains non-accidental injuries, even where the injuries were unexplained.” In re

 J.M., 255 N.C. App. 483, 495, 804 S.E.2d 830, 838–39 (2017); see In re T.H.T., 185

 N.C. App. 337, 648 S.E.2d 519 (2007) (affirming an abuse adjudication where a

 physician concluded a child’s skull fracture was caused by non-accidental means, the

 mother’s explanations were not consistent with the injuries observed, and the mother

 failed to seek medical attention for the child). Additionally, this Court has held that

 a respondent mother’s knowledge of a substantial risk of serious physical injury posed

 to her children was sufficient to conclude that respondent “allowe[d] to be created a

 substantial risk of serious physical injury to the juvenile[s] by other than accidental

 means.” In re M.G., 187 N.C. App. 536, 549, 653 S.E.2d 581, 589 (2007), rev’d in part

 on other grounds, 363 N.C. 570, 681 S.E.2d 290 (2009) (upholding an abuse

 adjudication where the respondent mother knew of the respondent father’s violent

 and abusive nature and “failed to take the necessary steps to protect [her] minor

 children”). As our Court stated in In re K.L., the exact cause of a child’s injury may

 be unclear in a case involving an adjudication of abuse; however, if the trial court’s
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 findings of fact support the inference the respondents are responsible for the

 unexplained injury by clear and convincing evidence, the abuse adjudication will be

 affirmed. 272 N.C. App. 30, 40, 845 S.E.2d 182, 191, disc. rev. denied, 2020 N.C.

 LEXIS 1353 (2020).

¶ 31 In the instant case, the trial court concluded Respondents had “inflicted or

 allowed to be inflicted serious physical injury, possible by other than accidental

 means and/or created a serious risk of physical injury by other than accidental

 means” and “did not provide appropriate care or supervision for the juveniles and

 created an injurious environment placing the juveniles at substantial risk of harm.”

 The trial court made the following pertinent findings of fact, which support its

 adjudication of abuse:

 27. On March 12, 2020, the respondent parents along
 with the three juveniles lived with . . . the
 respondent father’s mother (paternal grandmother
 to the juveniles) . . . .
 28. The respondent mother was employed . . . and
 worked approximately sixty (60) hours each week,
 29. The respondent father was not employed. He
 indicated to hospital employees that he has post-
 traumatic stress disorder (PTSD).
 30. The respondent mother told co-worker [Robert] and
 her mother . . . that she had found [her children]
 alone and unsupervised on March 11, 2020 when she
 came home from work. She had no idea how long the
 juveniles had been left alone in the home.
 31. On March 12, 2020 the respondent mother told
 [Robert] and her mother that she was upset about
 finding the juveniles alone the day before.
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

32. The respondent mother told Robert and her mother
 that [the paternal grandmother] had held a gun to
 her while she was holding [Wes] as an infant. She
 reported that this was due to [the paternal
 grandmother] not taking her medication.
33. On July 14, 2018, the respondent parents spoke to a
 clinical social worker and the respondent mother
 noted that [the paternal grandmother] “can be
 verbally abusive to her” due to [the paternal
 grandmother’s] non-compliance with her
 medication.
34. On March 12, 2020, the respondent mother worked
 her shift . . . . During the shift the paternal
 grandmother drove the respondent father to the
 [respondent mother’s work] to get the pick-up truck
 that the respondent mother had driven to work that
 day. She was left without any way to get home after
 her shift. The respondent mother called the
 respondent father multiple times to pick her up and
 bring her home, but he did not answer any of her
 calls or texts. According to her co-worker and her
 mother, the respondent mother was very upset and
 crying that day. The respondent mother called her
 mother . . . to come pick her up from [work].
35. Around 4:30 pm [Robert] saw the respondent father
 and [the paternal grandmother] at [the respondent
 mother’s work] together in the pick-up truck without
 the juveniles.
36. [The maternal grandmother] took the respondent
 mother to her house and not to the respondent
 mother’s home on March 12, 2020 between 5:30 pm
 and 6:00 pm.
37. After the respondent mother had left [work], the
 respondent father arrived and inquired if the
 respondent mother was still there.
38. After the respondent father left [the respondent
 mother’s work] (sometime after 6:00 pm), [the
 paternal grandmother] arrived and came inside the
 store and left a few minutes later.
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

39. After appearing at [the respondent mother’s work],
 [the paternal grandmother] called the store several
 times and spoke to the manger [sic]. [Robert] heard
 [the paternal grandmother] call the respondent
 mother names and said the respondent mother had
 been at work since 6:00 a.m. and that she needed to
 come home and take care of her kids and if she
 doesn’t come home someone will take care of her kids
 for her.
40. The respondent father came to [the maternal
 grandmother’s] home and spoke to the respondent
 mother and [the maternal grandmother] for
 approximately two hours. During the conversation,
 the respondent father’s phone rang approximately
 eighteen (18) times with the paternal grandmother
 calling him, between 7:01 and 7:52 pm. He did not
 answer and tossed his phone at one point because he
 was tired of the repeated calls. At 7:52 pm the
 respondent father answered the call from his mother
 and then hurried the respondent mother home
 without telling her the nature of the phone call. The
 paternal grandmother did not call the respondent
 father again until 8:42 pm, right as the respondent
 parents arrived at Moses Cone hospital with [Wade].
....
42. When the respondent parents returned home, [the
 paternal grandmother] was holding [Wade] (the
 youngest juvenile) in her arms, wrapped in a blanket
 and she told the respondent parents that [Wade] had
 been burned. The respondent mother took [Wade],
 walked him up the stairs, laid him down and
 unwrapped the blanket to inspect his injuries (which
 were bleeding, blistered, and oozing at that time)
 before she wrapped him back up and took him
 downstairs and out to the car. The respondent
 parents then took [Wade] to Moses Cone hospital.
43. They arrived at Moses Cone hospital at 8:41 pm.
 Both respondent parents told hospital employees
 that [Wade] was in his swing when the family dog
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 knocked over the swing causing [Wade] to fall out of
 the swing and onto a space heater. That this
 happened just prior to arrival and they came
 immediately to Moses Cone. This series of events
 was a complete lie that was told by both parents and
 the paternal grandmother over and over to hospital
 employees, social workers, and law enforcement.
 The respondent parents did not just panic and tell a
 story about [Wade’s] injuries on March 12, 2020;
 they conspired together with [the paternal
 grandmother] to develop a completely false
 narrative.
44. At no time between [the paternal grandmother]
 discovering [Wade’s] injury and arrival at 8:41 pm
 did anyone call 911. [The paternal grandmother] did
 not call 911 while she was at home alone with the
 juveniles; instead she called the respondent father
 18 times before he answered his phone. The
 respondent parents did not call 911 after learning of
 the injuries, when they saw [Wade] at the home or
 on the way to the hospital.
45. The lack of supervision of these juveniles led to
 [Wade] sustaining his injuries.
46. [Wade] was transported via ambulance to Wake
 Forest Baptist Medical Center (WFBMC)/Brenner’s
 Children’s Hospital at 11:15 pm. By 2:30 a.m. abuse
 protocol was initiated, and security was placed
 bedside for [Wade]. There was a note that a social
 worker consult was required because of “vague
 explanations by parents” of the mechanism of
 [Wade’s] injuries.
47. The WFBMC records have different stories about
 how [Wade] sustained his injuries: He was in a
 rocker, glider, tripod swing, or wooden bassinet; he
 was knocked out of the swing and onto the heater;
 he rolled out of the rocker and rolled into the heater.
 At some point, a physician notes that [Wade’s] burns
 were consistent with burns from a heater, but it was
 not likely that there was a dog involved.
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

48. [Wade] sustained first, second, and third degree
 burns to 8.3 percent of his body area, concentrated
 on the left thigh, calf, and foot. He had second
 degree burns around his left hip area and a slight
 first degree burns to the left abdomen and under his
 left arm. He required surgery to remove the dead
 skin. [Wade] remained at WFBMC until April 2,
 2020.
49. Guilford County social worker (SW) Cquadayshia
 Sharpe received an investigative assessment for
 physical abuse and/or injurious environment that
 required immediate response on March 13, 2020.
50. SW Sharpe went to [the respondents’ home] and met
 with [the paternal grandmother] on March 13, 2020.
 [The paternal grandmother] would not allow SW
 Sharpe inside the home or to have access to the two
 juveniles that were present [Wren and Wes]. When
 SW Sharpe indicated that she would have to get law
 enforcement involved if she could not see the two
 juveniles, [the paternal grandmother] brought the
 juveniles outside. SW Sharpe tried to talk to [Wes],
 but [the paternal grandmother would answer the
 questions for the juvenile.
....
52. The respondent father indicated to hospital
 employees and the Guilford County Department of
 Social Services (GCDSS) that he hired an attorney
 within days of March 12, 2020.
53. SW Sharpe was never allowed into the home
 voluntarily by the respondent parents or [the
 paternal grandmother]. She set up one walk
 through for March 16, 2020, however, the
 respondent father called and canceled that on advice
 of counsel.
....
64. There are many inconsistencies in the respondent
 parents’ stories about this incident, as delineated in
 the findings of fact and also including, but not
 limited to, the heater being run for days even though
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 it was warm outside, [Wade] only wearing a diaper
 and shirt even though it was cold enough to run the
 heater, and the children were being kept in that
 room to keep them warm.
....
93. Although respondent mother had concerns with
 [Wren’s] behaviors at her 12-month well child
 checkup, respondent mother did not attend a parent
 educator appointment nor did [Wren] attend her 15-
 month well child appointment. The respondent
 parents brought up [Wren’s] challenging behaviors
 (and specifically repeated attempts to hurt other
 people) at [Wade’s] one-month well baby check on
 January 17, 2020 but cancelled her 18-month
 appointment three times in the month of February
 and rescheduled when she was 20 months old
 (March 30, 2020). The respondent parents had
 allowed [Wren’s] Medicaid coverage to lapse. The
 respondent parents have not attended to [Wren’s]
 medical needs as necessary.
94. If the respondent parents had such a concern about
 [Wren’s] behavior’s towards others, leaving she and
 [Wade] in a bedroom unattended would not have
 been appropriate.
95. “Although it is possible, I find it highly unlikely that
 [Wren] climbed out of her crib, displaced [Wade]
 from his cradle, and then climbed back into her crib.”
 This statement from Dr. Esther Smith, MD was
 noted on page 16 of [Wren’s] CME.
....
99. [Wade] did not roll over by himself until he was
 placed in kinship placement with the [maternal
 grandparents], which would have been sometime
 after April 2, 2020. He could not roll over by himself
 on March 12, 2020.
100. Dr. Esther Smith, MD indicated that [Wade’s]
 sleeping environment was unsafe in that it was in
 close proximity to a heat source, there were
 excessive blankets creating a suffocation risk, and a
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 fall risk due to an improperly assembled rocking
 cradle.
 101. Dr. Esther Smith, MD spoke to Dr. Meggan
 Goodpasture, who reported meeting with [the
 maternal grandmother] and then with the
 respondent father. Dr. Goodpasture “felt the initial
 meeting was not even that inflammatory, dad just
 seemed controlling.” Dr. Goodpasture was aware of
 an allegation of domestic violence between the
 parents, but the hospital “staff could never get mom
 alone.” After Dr. Goodpasture advised [the maternal
 grandmother] to explain any safety concerns to CPS,
 she received a call from the hospital compliance
 department, advising that respondent father does
 not want her going back into [Wade’s] room any
 further. This was documented on page 4 of [Wade’s]
 CME.
 102. That in regard to [Wade], the respondent parents
 and/or caretaker have inflicted or allowed to be
 inflicted serious physical injury, possible by other
 than accidental means and/or created a serious risk
 of physical injury by other than accidental means.
 103. That the juveniles’ parents and/or caretaker did not
 provide appropriate care or supervision for the
 juveniles and created an injurious environment
 placing the juveniles at substantial risk of harm.

¶ 32 Respondent-Mother contends finding of fact 102 is a conclusion of law. We

 agree. Accordingly, we will review finding of fact 102 as a conclusion of law below.

 See Stan D. Bowles Distributing Co. v. Pabst Brewing Co., 69 N.C. App. 341, 344, 317

 S.E.2d 684, 686 (1984) (“If [a] finding of fact is essentially a conclusion of law . . . it

 will be treated as a conclusion of law which is reviewable on appeal.”). Respondents

 do not challenge any other findings of fact; therefore, the remaining findings of fact
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 are deemed supported by competent evidence and are binding on appeal. See In re

 J.M.W., 179 N.C. at 792, 635 S.E.2d at 919.

¶ 33 Respondent-Mother relies on In re K.L. in arguing the trial court’s abuse

 adjudication must be reversed because there is no clear and convincing evidence that

 Wade’s injury was non-accidental. 272 N.C. App. 30, 845 S.E.2d 182. In In re K.L.,

 our Court reversed the trial court’s order adjudicating a juvenile abused on the basis

 that there was “nothing to bridge the evidentiary gap between the unexplained

 injuries . . . and the conclusion that Respondents inflicted them . . . .” Id. at 46, 845

 S.E.2d at 194. Multiple physicians testified at the adjudication hearing. Id. at 34–

 35, 845 S.E.2d at 187. Although one treating doctor who testified had ordered the

 child’s entire body to be assessed for other injuries, he made no abnormal findings.

 Id. at 34, 845 S.E.2d at 187. Despite the lack of abnormal findings, the doctor opined

 that some type of physical abuse was “highly probable” because the parents could not

 provide a history to explain the six fractures in the child’s legs. Id. at 34, 845 S.E.2d

 at 187. The Court reasoned that reversal of the abuse adjudication was proper on the

 ground there were no red flags in the record such as substance abuse, domestic

 violence, or inappropriate discipline or other evidence by which the trial court could

 infer the child was abused; thus, the fact that respondents could not explain the

 baby’s fractures was insufficient to support the trial court’s conclusion of abuse. Id.

 at 46, 845 S.E.2d at 194. Furthermore, the respondent mother did not delay in
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 seeking medical treatment and was “forthcoming and cooperative” in DDS’s

 investigation. Id. at 46, 845 S.E.2d at 194. Finally, there was no clear or convincing

 evidence to support the finding the child’s injury had occurred while the child was in

 the exclusive care of the parents on a certain date. Id. at 37–38, 845 S.E.2d at 189–

 190.

¶ 34 We reject Respondent-Mother’s contention that In re K.L. demands reversal of

 the trial court’s adjudications in this case. We note it is undisputed that Wade’s

 injury occurred on 12 March 2020 while he was in the exclusive care of the children’s

 caretaker, the paternal grandmother. Here, unlike In re K.L., there are ample,

 unchallenged findings of fact to support the inference the child’s injury occurred by

 non-accidental means. See id. at 40, 845 S.E.2d at 191.

¶ 35 First, doctors and social workers pointed to multiple red flags of potential

 domestic abuse, which were documented in the trial court’s findings of fact, including

 findings of fact 32, 33, 43, 46, 47, 64, 95, 99, and 100. These findings of fact establish

 the paternal grandmother had made several threats to or regarding Respondent-

 Mother or the children including on the day of Wade’s injury; Respondents and the

 paternal grandmother conspired to create “false narratives”; Respondents and the

 paternal grandmother repeated multiple, inconsistent stories regarding the events

 surrounding Wade’s injuries, who was caring for Wade on 12 March 2020, and when

 treatment was sought; Respondents provided vague, improbable explanations
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 regarding the mechanism of the injury; Respondents’ final story of events blaming

 their toddler daughter was “highly unlikely”; and doctors treating Wade had reasons

 to suspect abuse in Respondents’ home, including BCH receiving an anonymous call

 in which the caller alleged domestic abuse in Respondents’ home. These

 unchallenged findings of fact are deemed supported by clear and convincing evidence.

 See In re J.M.W., 179 N.C. at 792, 635 S.E.2d at 919.

¶ 36 Second, the findings of fact show there was a delay of approximately one hour

 and forty minutes from the time the paternal grandmother initially called

 Respondent-Father at 7:01 p.m. to report the injury to 8:41 p.m. when Wade was

 taken to the hospital for treatment; at no point did the paternal grandmother or

 either Respondent seek emergency medical services from 911 for Wade’s severe

 burns.

¶ 37 Finally, findings of fact 50, 53, 63, 70, 73, 77, and 80 show Respondents were

 not “forthcoming” or “cooperative” with the agencies handling investigations into

 Wade’s injuries, including GCDSS, ACDSS, and the Guilford County Sheriff’s Office;

 rather, Respondents told a “complete lie” and multiple “false narratives” to explain

 Wade’s injury and would not assist ACDSS with completing a review of Respondents’

 home to ensure concerns were addressed. In re K.L., 272 N.C. App. at 46, 845 S.E.2d

 at 194. For the previously stated reasons, “the trial court’s findings of fact . . . support

 the inference” Respondents and the paternal grandmother are responsible for Wade’s
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 injury, and the injury was non-accidental. See In re K.L., 272 N.C. App. at 40, 845

 S.E.2d at 191.

 2. Conclusions of Law regarding Abuse

¶ 38 As an initial matter, we consider finding of fact 102 as a conclusion of law to

 determine whether it is supported by the findings of fact. See In re F.C.D., 244 N.C.

 App. at 246 780 S.E.2d at 217. Respondent-Mother focuses on the trial court’s lack

 of the essential element of “non-accidental means” to argue Respondents and the

 paternal grandmother did not inflict serious physical injury on Wade, in violation of

 N.C. Gen. Stat. § 7B-101(1)(a) (2019). She fails to address the trial court’s conclusions

 that Respondents posed a “substantial risk of harm” to the children and there was a

 “serious risk of physical injury by other than accidental means” in the home.

 However, as analyzed in detail above, there are sufficient findings of fact to support

 the legal conclusions that the injury was non-accidental, and Wade is an abused

 juvenile as defined by N.C. Gen. Stat. § 7B-101(1)(b). See In re F.C.D., 244 N.C. App.

 at 246 780 S.E.2d at 217; N.C. Gen. Stat. § 7B-101(1)(b).

¶ 39 Both Respondents maintain that there was no witness testimony to support a

 finding that the injuries were non-accidental. We find Respondents’ arguments that

 witness testimony is required to support a finding that an injury is “non-accidental”

 are without merit. Respondents point to no cases to support their contentions that

 medical testimony or other witness testimony is required to prove under N.C. Gen.
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 Stat. § 7B-101(1) an injury is “by other than accidental means.” We note in the

 instant case, there is no witness testimony, or any other direct evidence for that

 matter, that the juvenile was burned through “non-accidental” means. Again, the

 trial court’s conclusion is supported by sufficient, binding findings, which in turn

 support the inference the injuries were non-accidental.

¶ 40 Next, Respondents both argue that the lack of supervision of a juvenile falls

 under the statutory definition of neglect, not abuse. In re K.B., our Court considered

 this argument when a trial court found a juvenile’s parents failed to properly provide

 the juvenile with his prescribed medications used to treat his mental health and

 behavioral issues and adjudicated the minor abused, neglected, and dependent. 253

 N.C. App. 423, 428, 801 S.E.2d 160, 164 (2017). The trial court also found the parents

 did not properly supervise the special-needs juvenile to ensure he would not hurt

 himself. Id. at 435, 801 S.E.2d at 167–68. We upheld the trial court’s adjudications

 and held the respondents created a substantial risk of physical injury by other than

 accidental means by failing to provide the juvenile’s medication and by failing to

 provide adequate supervision of their child; therefore, the trial court’s findings

 supported the conclusion that the juvenile was abused. Id. at 435, 801 S.E.2d at 168.

¶ 41 Similar to In re K.B., in the case sub judice, the trial court made multiple

 findings, including findings of fact 31, 35, 38, and 45, to support the conclusion

 Respondents created a substantial risk of physical injury for their young juvenile
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

children by allowing them to be left unsupervised. See id., 253 N.C. App. at 434–35,

801 S.E.2d at 167–68. The findings show Respondent-Mother knew of the paternal

grandmother’s unstable behavior, which necessitated medication, and the substantial

risk of physical injury her volatile conduct posed to the children. See In re M.G.,187

N.C. App. at 549, 653 S.E.2d at 589; In re L.C., 253 N.C. App. 67, 72, 800 S.E.2d 82,

87 (2017) (stating a respondent mother’s knowledge of her child’s previous abuse in

her home would support a conclusion that the parent allowed a substantial risk of

serious injury to the child to be created by allowing the perpetrator to remain in the

home). Despite this risk, Respondent-Mother allowed the paternal grandmother to

continue to care for her children, and she failed to take steps to ensure her children

were properly supervised and protected. See In re M.G.,187 N.C. App. at 549, 653

S.E.2d at 589. The unchallenged findings of fact 32, 33, and 39 establish the paternal

grandmother pointed a gun and threatened Respondent-Mother while in the close

presence of Wes when he was an infant due to the paternal grandmother failing to

take her medication; the paternal grandmother was verbally abusive to Respondent-

Mother when she did not take her medication; and, on the day of the injury, the

paternal grandmother left the small children alone in the home and later called

Respondent-Mother’s manager at work to call Respondent-Mother names, and to

threaten “someone w[ould] take care of [Respondent-Mother’s] kids for her” if she did

not. Therefore, we hold the trial court’s adjudication of abuse is supported by findings
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 of fact, which are in turn deemed supported by clear and convincing evidence. See In

 re F.C.D., 244 N.C. App. at 246 780 S.E.2d at 217.

 B. Adjudication of Dependency

¶ 42 Respondent-Mother argues that there was no evidence in the record or findings

 of fact made by the trial court to demonstrate her inability to care for the children.

 Similarly, Respondent-Father contends the trial court did not find he or Respondent-

 Mother was unable to care for their children. We disagree.

¶ 43 The Juvenile Code defines a “dependent juvenile” as a

 [j]uvenile in need of assistance or placement because (i) the
 juvenile has no parent, guardian, or custodian responsible
 for the juvenile’s care or supervision or (ii) the juvenile’s
 parent, guardian, or custodian is unable to provide for the
 juvenile’s care or supervision and lacks an appropriate
 alternative child care arrangement.

 N.C. Gen. Stat. § 7B-101(9) (2019). The trial court is required to make findings of

 facts that address both prongs of N.C. Gen. Stat. § 7B-101(9): (1) the parent’s inability

 to provide care or supervision; and (2) the unavailability to the parent of alternative

 child care arrangements before a juvenile may be adjudicated as dependent. In re

 P.M., 169 N.C. App. 423, 427, 610 S.E.2d 403, 406 (2005). A juvenile may not be

 adjudicated dependent so long as at least one parent is capable of providing or

 arranging for adequate care and supervision of the child. In re V.B., 239 N.C. App.

 340, 342, 768 S.E.2d 867, 868 (2015).
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

¶ 44 “[T]he purpose of an adjudicatory hearing [for a dependency proceeding] is to

 determine only ‘the existence or nonexistence of any of the conditions alleged in a

 petition.’” In re V.B., 239 N.C. App. at 344, 768 S.E.2d at 869–70 (quoting N.C. Gen.

 Stat. § 7B-802).

¶ 45 Here, the trial court made the following uncontested findings of fact pertinent

 to the children’s dependency adjudication:

 45. The lack of supervision of these juveniles led to
 [Wade] sustaining his injuries.
 ....
 80. ACDSS was not allowed to enter into the respondent
 parent’s home before the petition was filed even
 though the juveniles were not placed at that
 residence. ACDSS attempted at least six (6) home
 visits with the respondent parents before the
 petition was filed. ACDSS was unable to follow up
 with an in-home review (before the petition was
 filed) to see if any concerns had been corrected.
 ....
 82. On July 21, 2020 [the maternal grandmother] told
 ACDSS social workers that she was overwhelmed
 with all three juveniles, that she had “backhanded”
 [Wren] because [Wren] split in [her] face, and that
 she was frustrated with the respondent parents
 being late to their visits. ACDSS immediately
 removed the juveniles from the [maternal
 grandparents] home and began finding another
 placement.
 ....
 86. Between July 21, 2020 and August 21, 2020, ACDSS
 inquired of the respondent parents for an alternative
 plan of care for the juveniles. The respondent
 parents were able to give two names to SWS
 Baldwin for the vetting process. ACDSS received
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 lots of calls and emails from random individuals
 inquiring about caring for the juveniles during this
 time period. ACDSS would not discuss the care of
 the juveniles on these calls and emails due to
 confidentiality. ACDSS followed up with the
 respondent parents by asking them repeatedly to not
 have random people call ACDSS, but rather just
 submit their proposed caregivers to SW Chaney and
 SWS Baldwin.
87. Of the two names that were given to ACDSS by the
 respondent parents, one person was determined to
 work at ACDSS (but not in the CPS unit) and was
 thus ineligible. The second person called ACDSS
 and left a voicemail stating that he was a neighbor
 of the respondent parents and was approached
 randomly by the respondent father and asked to care
 for the juveniles. He indicated that he was not able
 to care for the juveniles.
88. This failure to make an appropriate plan of care for
 the juveniles led to the filing of the petitions on
 August 21, 2020.
89. [Wes] did not see a primary care pediatrician . . .
 from 7 months until he was 32 months old. He also
 went from age 32 months until age 5 years old
 without seeing a primary care pediatrician. In his
 medical records, there were notes about
 developmental delays (including severe delayed
 speech) and a concern about possible autism and
 services were recommended to the parents, but they
 were discontinued due to multiple missed
 appointments. [Wes] failed a hearing test at age 5,
 but passed a hearing test at age 6. The respondent
 parents have not attended to [Wes’s] developmental
 and medical needs as necessary.
....
91. Although [Wes] had developmental delays, the
 respondent parents did not enroll him in public
 kindergarten. They also did not have an established
 home school structure in place for [Wes]. The
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 respondent parents have not attended to [Wes’s]
 educational needs as necessary.
 ....
 93. Although respondent mother had concerns with
 [Wren’s] behaviors at her 12-month well child
 checkup, respondent mother did not attend a parent
 educator appointment nor did [Wren] attend her 15-
 month well child appointment. The respondent
 parents brought up [Wren’s] challenging behaviors
 (and specifically repeated attempts to hurt other
 people) at [Wade’s] one-month well baby check on
 January 17, 2020 but cancelled her 18-month
 appointment three times in the month of February
 and rescheduled when she was 20 months old
 (March 30, 2020). The respondent parents had
 allowed [Wren’s] Medicaid coverage to lapse. The
 respondent parents have not attended to [Wren’s
 medical needs as necessary.
 ....
 100. Dr. Esther Smith, MD indicated that [Wade’s]
 sleeping environment was unsafe in that it was in
 close proximity to a heat source, there were
 excessive blankets creating a suffocation risk, and a
 fall risk due to an improperly assembled rocking
 cradle.
 ....
 103. That the juveniles’ parents and/or caretaker did not
 provide appropriate care or supervision for the
 juveniles and created an injurious environment
 placing the juveniles at substantial risk of harm.
 104. The juveniles’ parents and/or caretaker did not have
 an appropriate, alternative plan of care.

¶ 46 In this case, ACDSS filed its petitions on 21 August 2021 alleging all three

 children were dependent. Prior to the petitions being filed, ACDSS gave Respondents

 the opportunity to provide an alternative kinship placement because the placement
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 with the neighbors of the maternal grandparents was scheduled to end on 21 August

 2021. When Respondents could not provide another placement, ACDSS sought non-

 secure custody. ACDSS also gave Respondents the opportunity to address the

 agency’s concerns with their home; however, Respondents failed to allow ACDSS to

 perform an in-home review to assess the changes and refused ACDSS into their home

 on more than six occasions. Based on the findings of fact, the trial court concluded

 as a matter of law that Wade, Wren, and Wes were dependent juveniles under N.C.

 Gen. Stat. § 7B-101(9).

¶ 47 The above findings of fact related to the juveniles’ dependency were not

 challenged by Respondents; thus, the findings are binding on appeal. See In re

 J.M.W., 179 N.C. at 792, 635 S.E.2d at 919. The findings of fact establish: (1)

 Respondents’ lack of care and supervision over the children led to Wade’s injury; (2)

 Respondents were unable to provide ACDSS with an alternative plan of care for the

 children after the temporary placement with the maternal grandparents’ neighbors

 ended; (3) Respondents failed to meet Wes’ educational needs; and (4) Respondents

 failed to meet the children’s medical needs. We hold the findings of fact are sufficient

 to support a conclusion that Respondents were “unable to provide for the juvenile[s’]

 care or supervision and lack[ed] an appropriate alternative child care arrangement.”

 See N.C. Gen. Stat. § 7B-101(9).

 V. Disposition
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 A. Steps toward Reunification

¶ 48 The North Carolina General Statutes grants a trial judge the authority to order

 a parent at a dispositional hearing to “[t]ake appropriate steps to remedy conditions

 in the home that led to or contributed to the juvenile’s adjudication or to the court’s

 decision to remove custody of the juvenile from the parent . . . .” N.C. Gen. Stat. § 7B-

 904(d1)(3) (2019). “For a court to properly exercise the authority permitted by

 [Section 7B-904(d1)], there must be a nexus between the step ordered by the court

 and a condition that is found or alleged to have led to or contributed to the

 adjudication.” In re T.N.G., 244 N.C. App. 398, 408, 781 S.E.2d 93, 101 (2015)

 (citation omitted).

¶ 49 In this case, the trial court ordered Respondent-Mother to take part in certain

 activities which it found were reasonably related to the reasons for the juveniles’

 removal and were aimed at achieving the plan of reunification. Respondent-Mother

 challenges portions of the following steps imposed by the trial court:

 1. The mother is to provide proof of a sufficient source of
 income to support herself and her children and use
 funds to meet basic needs. She can work to achieve this
 goal by providing income receipts and a budget to the
 [social worker].
 2. That the mother will refrain from allowing mental
 health to impact parenting and provide a safe,
 appropriate home by not exposing her children to
 injurious environment. In order to achieve this goal,
 the mother will obtain and follow the recommendations
 of a mental health assessment and psychological
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 evaluation. The mother will also participate in
 domestic violence assessment and participate in all
 recommended services.

¶ 50 Respondent-Mother first argues that her “only ‘fault’ [is] she was working

 many hours to provide financially for her family and left her children in the care of

 their grandmother;” thus, the requirement to show proof of income is unnecessary.

 We disagree.

¶ 51 Here, the trial court found a condition that led to the children’s adjudication

 was lack of care and supervision. In response, the court ordered Respondent-Mother

 to show proof of income. This requirement is reasonably related to ensuring the

 children have adequate care and supervision and to addressing the risk factors

 identified by ACDSS, including to ensure a safe home environment. See In re A.R.,

 227 N.C. App. 518, 522, 742 S.E.2d 629, 623–33 (2013) (holding proof of income was

 reasonably related to remedying the condition of domestic violence, which led to

 children’s removal from their parents’ home).

¶ 52 Next, Respondent-Mother argues there is no evidence in the record that she

 suffered from mental illness; therefore, the provision that Respondent-Mother

 “refrain from allowing mental health to impact [her] parenting” bears no relationship

 to her children’s removal from her home. We disagree. Again, the trial court’s

 findings that Respondent-Mother had conspired with Respondent-Father and the

 paternal grandmother “to develop a completely false narrative” about Wade’s injuries
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 and that Respondent-Mother “promulgated [a] false narrative” about her toddler

 child being at fault for Wade’s burns support the trial court’s mandate. Additionally,

 physicians and social workers had reason to suspect domestic violence occurred in

 Respondents’ home but “could never get mom alone” and the social workers were

 never able to complete their in-home review before the adjudication petitions were

 filed. The trial court’s decree is reasonably related to ensuring the children’s safety

 and proper supervision.

¶ 53 We hold the trial court’s order that Respondent-Mother show proof of income

 and “refrain from allowing mental health to impact parenting” are “appropriate steps

 to remedy conditions in the home that led to or contributed to the juvenile’s

 adjudication.” See N.C. Gen. Stat. § 7B-904(d1)(3).

 B. Visitation

¶ 54 Respondent-Mother contends the trial court abused its discretion by limiting

 Respondent-Mother’s visitation with her children to one-hour of highly supervised

 weekly visits because “[t]here is absolutely zero evidence in the record that

 [Respondent-Mother] presented any kind of threat to harm her children.” We

 disagree.

¶ 55 “This Court reviews the trial court’s dispositional orders of visitation for an

 abuse of discretion.” In re C.M., 183 N.C. App. 207, 215, 644 S.E.2d 588, 595 (2007)

 (citation omitted).
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

¶ 56 N.C. Gen. Stat. § 7B-905.1 provides:

 [a]n order that removes custody of a juvenile from a parent
 . . . or that continues the juvenile’s placement outside the
 home shall provide for visitation that is in the best
 interests of the juvenile consistent with the juvenile’s
 health and safety, including no visitation.

 N.C. Gen. Stat. § 7B-905.1(a) (2019).

¶ 57 Here, the trial court addressed Respondent-Mother’s visitation with her

 children in its dispositional order and granted the following plan:

 [Respondent-Mother] shall have visitation on Fridays from
 11 a.m. until 12 p.m. which is consistent with the juveniles’
 health and safety. That the level of supervision shall
 include high—eyes and ears on, direct supervision. The
 parties may mutually agree to additional visitation with
 the same level of supervision or to change the location of
 visitation.

¶ 58 Respondent-Mother relies on the trial court’s finding that the visits with her

 children while they were placed with the neighbor of the maternal grandmother were

 “normal” and “loving” to argue her visitation should not have changed from four hours

 per day to once per week after the children were placed in a foster home. However,

 Respondents were aware that the neighbors could act only as a temporary placement

 until 21 July 2020. Respondents failed to provide ACDSS with the name of an

 appropriate alternative placement before the placement with the neighbors ended.

 Accordingly, ACDSS filed petitions and sought nonsecure custody of the children.

 ACDSS placed the children with a foster family in Moore County, an approximate
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 one-and-a-half-hour drive from Respondents’ home, so that all three children could

 be placed together. Respondent-Mother fails to cite to any case in which this Court

 held that a limitation on visitation to once per week was an abuse of discretion after

 a juvenile had been placed in foster care. The highly supervised, one-hour weekly

 visits with Respondents is consistent with the 4 November 2020 recommendation of

 the guardian ad litem as well as ACDSS’s recommendations in its 18 November 2020

 dispositional court report. Additionally, the trial court’s order allows the option for

 the foster family and Respondents to agree to additional visitation time. Therefore,

 the trial court had a reasonable basis for limiting Respondent-Mother’s visitation

 with the children to one-hour, weekly visits.

 C. Constitutional Right to Parent

¶ 59 “The standard of review for alleged violations of constitutional rights is de

 novo.” In re L.C., 253 N.C. App. 67, 72, 800 S.E.2d 82, 87 (2017) (citation omitted).

 “[A] trial court’s determination that a parent’s conduct is inconsistent with his or her

 constitutionally protected status must be supported by clear and convincing

 evidence.” Adams v. Tessener, 354 N.C. 57, 63, 550 S.E.2d 499, 503 (2001) (citation

 omitted).

¶ 60 “This Court has held that where a parent is on notice that guardianship with

 a third party has been recommended and will be determined at the hearing, if the

 parent fails to raise this argument at the hearing, appellate review of the
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 constitutional issues is waived.” In re S.R.J.T., 2021-NCCOA-94 ¶ 17. In order for

 waiver to occur, the parent must have been afforded the opportunity to object or raise

 the argument at the hearing. In re R.P., 252 N.C. App. 301, 305, 798 S.E.2d 428, 431

 (2017); see In re C.P., 258 N.C. App. 241, 246, 812 S.E.2d 188, 192 (2018) (holding

 waiver occurred where a respondent did not “argue[ ] to the court or otherwise raise[

 ] the issue that guardianship would be an inappropriate disposition on a

 constitutional basis.”) (emphasis added).

¶ 61 In this case, Respondent-Mother’s counsel was on notice that guardianship of

 the children was recommended, and she had an opportunity to be heard at the

 dispositional hearing on the issue. In response, counsel stated at the hearing that

 Respondent-Mother would “of course . . . like to have custody of the children, and it’s

 her position that she could handle that. We would like to ask for expanded visitation,

 and that has been offered.” Counsel for Respondent-Mother also argued to the trial

 court at the dispositional hearing that the allegations against Respondents related to

 abuse, neglect, and dependency be dismissed and the children be returned to

 Respondents’ home. At no point during the hearing did Respondent-Mother or

 Respondent-Mother’s counsel raise the issue of Respondent-Mother’s constitutional

 rights afforded to her as a parent. Therefore, we hold Respondent-Mother waived her

 right to raise the constitutional argument on appeal. See In re T.P., 217 N.C. App.

 181, 186, 718 S.E.2d 716, 719 (2011) (holding the respondent mother waived review
 IN RE: W.C.T., W.J.A.T., & W.D.T.

 2021-NCCOA-559

 Opinion of the Court

 of the issue of whether she acted in a manner inconsistent with her constitutionally

 protect status as a parent because she failed to object at trial).

 VI. Conclusion

¶ 62 We affirm the trial court’s adjudication of Wade as an abused, neglected, and

 dependent juvenile and its adjudication of Wes and Wren as neglected and dependent

 juveniles. We hold the trial court did not err in mandating Respondent-Mother to

 show proof of income and “to refrain from allowing mental health to impact

 parenting” as appropriate steps to remedy the conditions in the Respondents’ home

 that led to the juveniles’ adjudications. We affirm the trial court’s visitation plan in

 the disposition order. Finally, we hold Respondent-Mother waived her constitutional

 argument as to the trial court’s conclusion that she acted in a manner inconsistent

 with her status as a parent.

 AFFIRMED.

 Judges DILLON and INMAN concur.